***********
This matter was reviewed by the Full Commission based upon the record of the proceedings before Deputy Commissioner Hoag, along with the briefs and arguments on appeal. The Full Commission MODIFIES the Deputy Commissioner's holding and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered by the parties at the hearing as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. An employer-employee relationship existed between the parties at all relevant times.
3. Copeland Corporation is self-insured with Crawford and Company as the third party administrators.
4. Plaintiff's average weekly wage has not been determined.
5. The date of plaintiff's alleged development of occupational diseases is 12 March 1997.
6. The following medical records were stipulated into evidence:
a) Dr. L. E. Smith;
b) Dr. Stephen J. Naso;
c) Dr. Kevin James;
d) Cleveland Physical Therapy;
e) Dr. Stephen W. Jones;
f) Dr. Anthony Wheeler;
g) Dr. P. Brent Gerrell;
h) Dr. Joseph LoPresti;
i) Dr. Martin M. Henegar; and
j) Dr. Joanna Woyciechowska.
7. The issues to be resolved are:
 a) Did plaintiff sustain occupational diseases as a result of her employment with defendant-employer?
 b) To what benefits, if any, is plaintiff entitled as a result of her alleged occupational diseases, including temporary total disability, temporary partial disability, if any, medical benefits and permanent partial or permanent total disability?
c) What is plaintiff's correct average weekly wage?
 ***********
Based upon the evidence of record, the Full Commission enters the following:
 FINDINGS OF FACT
1. At the times of her alleged injuries, plaintiff was a 34-year-old female. Plaintiff attended Shelby Senior High School and graduated in 1980. She also attended Cleveland Community College.
2. Plaintiff's prior job experiences included service in the U.S. Navy, as a driver taking patients to appointments from mental health institutions; as a detention officer for the Cleveland County Sheriff's Department, and as a clerical worker for a construction company.
3. Plaintiff sought employment with the Copeland Corporation and applied for a job on 6 December 1996. She gave as a reason for leaving her employment as a detention officer with the Cleveland County Sheriff's Department "changing of management." At the hearing in Shelby, plaintiff admitted that she was allowed to resign from the Sheriff's Department after being involved in an altercation which plaintiff characterized as a "scuffle."
4. Plaintiff first began work for defendant-employer on 11 March 1997 in the finishing department on the assembly line of defendant-employer's facility in Shelby, North Carolina.
5. Plaintiff's job duties included the insertion and tightening of bolts in the application of touch-up paint to motorized air compressors. Plaintiff was required frequently to use a vibrating drill during the performance of these duties. Defendant-employer manufactures more than 8,000 varieties of compressors of different sizes at the Shelby facility. During the course of an eight-hour shift, an average employee may have been required to work on as many as 200 different units.
6. During the initial period of plaintiff's employment, plaintiff was an employee in training. The job duties plaintiff performed were with the assistance of other employees who were training her with respect to her various responsibilities. As a new employee, plaintiff worked at a much slower pace than more skilled and experienced employees on the line. Her job was a production job.
7. On 12 March 1997, after one and a half days of work, plaintiff complained of pain in her right wrist and palm radiating up into both arms to defendant-employer's plant nurse, Myrna Hamrick.
8. Plaintiff was immediately moved to a different position on the assembly line and her job duties were changed to ones involving less frequent use of a pneumatic drill. An appointment was made for plaintiff to be examined by Dr. Steven J. Naso Jr. at Southern Surgical Associates Carolina Hand Center in Charlotte, North Carolina on 20 March 1997.
9. Prior to the appointment with Dr. Naso, plaintiff continued to work at a modified position in defendant's facility earning her full wages. She was involved in a gasket-packing job that was not a production line job.
10. On 18 March 1997, plaintiff again demanded to see a physician immediately. She was referred to Dr. Larry Smith at Shelby Family Practice. Dr. Smith diagnosed possible tendonitis in her forearms bilaterally and wrote her out of work for one week pending further evaluation from a specialist. Ms. Hamrick made the referral, and plaintiff was to be off work until 24 March 1997.
11. On 20 March 1997, plaintiff presented to Dr. Naso. She complained of tingling and numbness in both wrists. Dr. Naso diagnosed plaintiff with neuropraxia with diffused upper extremity pain particularly to the right arm. Plaintiff was released to return to work with the restrictions of avoiding vibrating tools, not being assigned work over her head and screwing bolts no more than an hour a day. Dr. Naso prescribed a Medrol Dosepak as well as Voltaran in addition to home stretch exercises.
12. Dr. Naso gave plaintiff a thorough physical examination. He did not find any positive Tinel's signs; however, he did find a Phalen's and Reverse Phalen's positive signs. He also noted an increase in tingling and numbness when pressing the olecranon or the lateral epicondyle. However, Dr. Naso did not schedule or carry out any nerve conduction studies because he felt that plaintiff could not have developed carpal tunnel syndrome at this early date in her employment.
13. According to Dr. Naso diffuse neuropraxia secondary to the use of vibrating tools is not an unusual diagnosis even though the use of vibrating tools had only been for several days.
14. Dr. Naso did not detect any other evidence of nerve compression, carpal tunnel syndrome, or any other condition involving nerve entrapment.
15. On 23 March 1997, one day before she was scheduled to return to work, as per Dr. Larry Smith, plaintiff presented to Dr. Kevin James at the Miller Orthopedic Clinic in Shelby, North Carolina, complaining of right shoulder discomfort. Plaintiff also made a visit to the emergency room on that date and reported difficulties at work on 24 March 1997 to the nurse twice.
16. Plaintiff had previously injured her right shoulder in a 1996 automobile accident for which she was awarded damages. She failed to disclose these facts to any of her physicians, including Dr. James and Dr. Naso. In addition, plaintiff failed to acknowledge the occurrence of the 1996 injury in her response to interrogatories propounded by defendant.
17. Dr. James diagnosed plaintiff with a muscle spasm and authorized her to return to duty of a light nature. He suggested clerical work. He also recommended physical therapy that was provided by defendants. In accordance with plant rules, plaintiff was asked to schedule physical therapy and to return to work after she had completed it. Plaintiff repeatedly did not return to work after physical therapy, going instead to her home, shopping, or to her mother's. On 25 March 1997, defendant-employer offered to allow plaintiff to review safety videos and to perform other clerical tasks. Both Dr. Naso and Dr. James approved this activity. On 31 March 1997, Dr. James authorized plaintiff to return to heavier but still light-duty work.
18. On 3 April 1997, plaintiff presented again to Dr. Naso after insisting that another appointment be set up. Plaintiff was very firm in stating at the hearing that she had desired to see Dr. Naso again but was not permitted to do so.
19. Dr. Naso noted on 3 April 1997, plaintiff had seen at least two other physicians and had been to the Emergency Room after seeing him for the first time. A major complaint plaintiff had and reported to Dr. Naso was an inability to elevate her shoulder. Dr. Naso stated the following:
 "I find there is a tremendous exaggeration in so far as the loss of motion is concerned, when I ask her to simply abduct the shoulder she goes up maybe 20 degrees and grimaces in pain and states that she could not go any further, however, when I ask her to take the affected hand and place it across her chest and touch the other shoulder she has no problem in doing this. I feel this patient's problem in so far as the tingling and numbness is real, I think this will gradually disappear I certainly feel that she can do a light-duty job as long as it does not necessitate vibrating tools and so far as the shoulder is concerned, I certainly do think that plaintiff has some discomfort of the shoulder but I feel she is highly exaggerating her condition."
20. Plaintiff was not pleased with Dr. Naso's evaluation and a confrontation between the two took place. Dr. Naso indicated that he did not wish to see plaintiff again.
21. Dr. Naso concluded that the numbness and tingling in plaintiff's extremities would subside if she discontinued the use of vibrating tools.
22. Dr. James was also puzzled by plaintiff's shoulder pain, he indicated that the etiology of her painful right shoulder was unclear and all the more puzzling because plaintiff had not reported any specific trauma. Dr. James prescribed Prednisone to be followed a non-steroidal anti-inflammatory.
23. Plaintiff presented to Dr. James again on 16 April 1997. Dr. James indicated to defendant-employer's nurse that plaintiff could do clerical work filing and answering the telephone. Dr. James was also puzzled by plaintiff's shoulder pain, stating:
 "She denies having fallen on the right shoulder, denies any type of tearing or pulling sensation that would make one think of a tear of a rotator cuff. She denies any specific pop or anything that would make one think of a dislocation or a subluxation of the right shoulder I do not feel that there is any overt traumatic events such as a dislocation I am still not certain why this would happen only two days after on the job, I cannot find any possible explanation that would cause all these symptoms in her shoulder the explanation of this is somewhat puzzling, I cannot account for her entire upper body feeling completely nervous because of the physical therapy."
24. Plaintiff has never described any specific injury to her right shoulder to any of her doctors. Plaintiff never sustained an injury by accident arising out of and in the course and scope of her employment giving rise to her shoulder injury nor did plaintiff develop an occupational disease involving her right shoulder.
25. There were numerous light-duty jobs available to plaintiff at defendant-employer's Shelby facility following her release to light-duty employment by Dr. James and Dr. Naso. These positions were offered to plaintiff and pre-approved by her treating physicians.
26. Plaintiff was offered the job of a gasket packer in the sub-assembly department. This job involved collecting various paper gaskets that were featherweight, inserting them into a plastic bag per written instruction, and heat-sealing the bag using a foot pedal. A bag of gasket materials like those to be handled by plaintiff was submitted into evidence.
27. The gasket pack position was within medical restrictions placed upon plaintiff at the time the position was offered to her. The position was suitable employment and a real job. Plaintiff's refusal to perform this job was unjustified.
28. Plaintiff was also offered the bulletin pack position within the sub-assembly department of defendant-employer's Shelby plant. This position involved the collection of pamphlets, fliers, and instruction manuals to be attached to products manufactured by defendant-employer. The materials were collected pursuant to written instructions, stapled together using a foot pedal, and attached to products manufactured by defendant-employer. A packet of the written materials assembled during the course of this work was admitted into evidence.
29. The bulletin pack position was within medical restriction placed upon plaintiff and was suitable for her. It also was a real job. Plaintiff's refusal to perform this job was unjustified.
30. Plaintiff was also offered the schedule distribution job within the sub-assembly department. This position involved the collection of screws, bolts, nuts and other small metallic parts pursuant to a set of written instructions. These parts were then placed in a plastic bag and heat-sealed using a foot pedal. A packet of these materials was admitted into evidence.
31. The schedule distribution job was within the medical restrictions placed upon plaintiff and was suitable for her and a real job. Plaintiff's refusal to perform this position was unjustified.
32. The gasket pack, bulletin pack and schedule distribution position are positions available within the competitive labor market in that they are regular positions at defendant-employer's Shelby facility, constituting an essential portion of the functioning of defendant-employer's facility and are jobs regularly filled by defendant-employer's salaried or hourly employees.
33. At the end of April, plaintiff began consulting her personal physician, Dr. Stephen W. Jones. He wrote plaintiff out of work several times; however, plaintiff refused to produce the out of work slips and also initially refused to supply the medical records.
34. On 2 May 1997, at the request of plaintiff, she was referred to Dr. Anthony Wheeler, a neurologist in Charlotte, North Carolina. After examining plaintiff, Dr. Wheeler diagnosed a possible right upper extremity tendonitis. He recommended that plaintiff return to light-duty work and approved the various sub-assembly jobs offered to plaintiff by defendant-employer.
35. After examining plaintiff Dr. Wheeler made the following observations:
 "She has no significant physiological tremor. Tremulousness appears emotionally mediated. There are definite psychosocial factors and adversarial perceptions regarding her work that are interfering with return to even light-duty. There is associated symptom magnification of moderate to severe degree."
Dr. Wheeler had no further diagnostic recommendations and considered plaintiff suitable for modified duty work.
36. Plaintiff was not happy with Dr. Wheeler's evaluation.
37. On 7 May 1997, plaintiff returned to Dr. Wheeler complaining that she had been mounting parts for sub-assembly and had had progressive swelling of her arms, shoulder soreness, elbow soreness and pain in her neck. She also reported that she was unable to watch videos due to shaking tremors.
38. Dr. Wheeler saw no significant swelling in either plaintiff's elbows or hands. He noted:
 "Plaintiff by history and by physical exam today, appears to have predominantly psychogenic processes which reinforce her perception of pain and disability caused by mild, if any, right elbow tendonitis Tremor is definitively psychogenic. The seemingly primary issues relate to plaintiff's primary desire to avoid return to work. Whether this is conscious and overt is unclear, however, the patient is conscious in her efforts to produce evidence for physician liability that supports her premise that she cannot return to work. This may be evidence that she is malingering."
39. On 15 May 1997, plaintiff again presented to Dr. Wheeler and was very confrontational. She was insistent about her pain indicating that she was completely honest in her presentation; however, she questioned Dr. Wheeler's credentials and told him to send a resume to her lawyer. Dr. Wheeler concluded that "primary issues relate to the patient's attitude and behavior regarding physician care and the recommendation as well that she return to work issues."
40. By 21 May 1997, Dr. Wheeler found no reason to continue treatment or care of plaintiff. He recommended that she be placed at MMI and indicated that there were no objective findings to support any impairment or to support her claim of persistent pain. He gave plaintiff a 0% permanent partial disability rating and indicated that she was not disabled and released for duty work. He did not intend that she would receive any further medical care from him.
41. Defendant-employer attempted on numerous occasions to refer plaintiff for a functional capacity evaluation; however, plaintiff repeatedly failed to attend all such appointments.
42. Defendant-employer has paid all medical expenses associated with the treatment necessary for plaintiff as a result of her development of neuropraxia during the course and scope of her employment with defendant-employer.
43. Between 13 March and 17 June 1997, plaintiff was absent from work for several days or parts thereof as a result of her development of neuropraxia or need to attend medical and physical therapy appointments. Defendant-employer paid plaintiff her full salary during this time. There is no evidence that plaintiff was absent for any days during this time for which she did not receive full compensation at her ongoing salary.
44. During plaintiff's testimony and cross-examination at the hearing in Shelby, plaintiff denied having the ability to perform such tasks as shopping, housework and other normal activities.
45. Between early April 1997 and the end of May 1997, defendant-employer retained Western Carolina Investigation Security to perform video surveillance on plaintiff. The surveillance caught plaintiff on camera performing a number of physical activities and using her hands and upper extremities freely and without limitation. She was observed lifting various objects while shopping in a mall, carrying what appeared to be full bags of groceries, driving, entering and exiting a vehicle, playing with children and performing fine motor tasks with her hands such as sorting mail. Plaintiff never appeared to be in any pain and in fact, was often smiling and laughing.
46. In May 1997, plaintiff was observed by co-employee, David Drum, shopping for various goods at a flea market. Mr. Drum observed her freely using her hands and upper extremities. When he identified himself as a Copeland employee, plaintiff feigned an injury to her right arm and ceased using her right arm while she was in Mr. Drum's presence. Prior to the time Mr. Drum identified himself as a Copeland employee, plaintiff had no difficulty in using her right arm.
47. Defendant-employer attempted to obtain copies of medical records from Dr. Jones but plaintiff refused to produce these records and instructed Dr. Jones not to provide copies of them. Defendant-employer did not authorize medical treatment with Dr. Jones. Due to plaintiff's failure to report to work without a valid medical excuse, her employment was terminated on 17 June 1997. Plaintiff has not returned to work since that time or, attempted to discuss work with defendant-employer since that time.
48. Dr. Jones referred plaintiff to Dr. Brent Ferrell. Dr. Ferrell recommended that plaintiff see Dr. Joseph LoPresti on 13 August 1997.
49. Dr. Ferrell examined plaintiff to determine whether or not she had arthralgias and arthritis. There was no indication that she did. Dr. Ferrell noted that plaintiff had prescriptions of Effexor, Inderal and Medrol Dose Pak. She also was receiving prescriptions for Flexeril and Motrin. He also noted that she had Depo-Provera injections and had been given Ultram.
50. Plaintiff first presented to Dr. LoPresti on 13 August 1997. She had symptoms suggestive of carpal tunnel syndrome bilaterally right worse than left. Dr. LoPresti prescribed Naprosyn and encouraged plaintiff to use her arms as much as possible and to go back to work, but not to lift more than ten pounds or do any repetitive arm activity. She continued to take anti-inflammatories and wore a wrist splint on both hands at night while sleeping.
51. Plaintiff had electromyograms of both upper extremities that were positive for bilateral carpal tunnel syndrome. A four-point ulna nerve study showed a drop in conduction velocity over the left elbow. The diagnosis was bilateral median neuropathies at the wrists and left ulna neuropathy at the elbow.
52. Dr. LoPresti gave plaintiff a written indication of what her restrictions were on a separate piece of paper indicating that she could return to work and work for 40 hours a week.
53. Dr. LoPresti referred plaintiff to a surgeon, Dr. Henegar, after determining that she did have carpal tunnel syndrome bilaterally. The evaluations and nerve conduction studies clearly indicated that plaintiff had carpal tunnel syndrome. According to Dr. LoPrestri and Dr. Henegar, plaintiff probably had some symptoms of carpal tunnel syndrome prior to her work at defendant-employer however, both indicated that the type of work that she was doing at Copeland could have caused her to become symptomatic.
54. According to Dr. LoPresti and Dr. Henegar, plaintiff was at a greater risk than a member of the general public of developing carpal tunnel syndrome while working at defendant-employer's, and doing repetitive work with vibrating tools.
55. In addition, Dr. LoPresti and Dr. Henegar believed that doing work at defendant-employer could have caused a person to become symptomatic with bilateral carpal tunnel syndrome even though manifesting no symptoms just prior to beginning work.
56. Plaintiff underwent left carpal tunnel release and left ulnar entrapment release on 10 October 1997. However, subsequent to the operation, plaintiff continued to maintain that she had numbness and tingling as well as tenderness in her left hand. She continued to report excruciating pain. Upon being tested and undergoing nerve conduction tests on the left upper extremity, plaintiff continued to complain of symptoms although the nerve conduction studies indicated that the release had been successful.
57. As of 12 February 1998, plaintiff was still complaining of "exquisite pain in her left upper extremities." Dr. Henegar noted that her lack of subjective improvement as "disconcerting."
58. On 22 January 1998, Dr. Henegar came out of his office in the waiting room and noted that plaintiff was playing a hand held "Wheel-of-Fortune" game video which she held in both hands and was working the buttons dexterously and energetically with both her thumbs. Dr. Henegar commented in his notes
 "The nonanatomic pain distribution and lack of physical evidence of reason for her pain raised the question of functional overlay. Her actions also raise that question as she was actively playing a hand held game, which required rapid repetitive dexterous movements of her fingers and thumbs bilaterally without difficulty prior to the examination. Her actions and complaints during the examination were inconsistent with her actions and activity prior to the initiation of the examination."
59. Although Dr. Henegar was reluctant to go ahead with an operation for right carpal tunnel syndrome, plaintiff insisted. Nerve entrapment in the right wrist was, according to the nerve conduction studies, worsening. Dr. Henegar noted:
 "It is difficult to establish the etiology for Ms. Harrison's persistent pain. It is certainly possible there is some component of neurogenic pain at work here. We will begin a course of Neurontin and I will see her in follow up."
60. Plaintiff was scheduled for right carpal tunnel release on 10 June 1998.
61. Subsequent to the operation, plaintiff continued to complain of symptoms consistent with right carpal tunnel syndrome. Nerve conduction studies indicated that problems with neurovelocity had been resolved due to the operation.
62. Dr. Henegar gave plaintiff Valium, Neurontin and Ibuprofen.
63. The last time plaintiff reported to Dr. Henegar was 29 June 1998. She missed additional appointments until 15 December 1998 when she again reported persistent pain in her elbow and both wrists. At that time, Dr. Henegar noted that plaintiff
 Has persistent complaints, which are not strictly anatomic. Nerve conduction studies, by report, show improvement in her nerve function without signs of neural entrapment."
64. Plaintiff has continued to consult doctors. Most recently, she presented to Dr. Joanna Woyciechowska in Shelby, North Carolina to complain of numbness and pain in the ulna and radial aspects of both hands. She underwent nerve conduction velocity tests and there was no evidence of residual ulna entrapment or median nerve dysfunction. Additional doctors including Dr. Williams and Dr. Michael Kaufman have seen plaintiff. She is continuing to take Neurontin given her by Dr. Henegar, as well as Lorazepam and Thorazine, despite her carpal tunnel operations that neurologically were a success. She continues to complain of pain in her left and right hands, elbows, and in her right shoulder.
65. No doctor has ever suggested that plaintiff is permanently and totally disabled or even that she has any permanent partial impairment.
 ***********
Based upon the foregoing findings of fact, the Full Commission rejects the conclusions made by the Deputy and concludes as follows:
 CONCLUSIONS OF LAW
1. In order for disability to be compensable in the Workers' Compensation Act, it must be the result of an accident arising out of and in the course and scope of her employment or be an occupational disease. Plaintiff has failed to demonstrate by a preponderance of the evidence, or any evidence at all, that she sustained an injury by accident arising out of the course and scope of her employment to her right or left shoulder. In fact, the logical explanation for plaintiffs shoulder problems was an automobile accident of 1996, which went unreported to all her physicians. N.C. Gen. Stat. § 97-2.
2. In order for the occupational disease of bilateral carpal tunnel syndrome to be compensable, plaintiff must prove by preponderance of competent credible evidence of record that her employment caused her occupational disease and that she was put at a greater risk of developing that disease than an ordinary member of the work force. In addition, the disease must be due to causes and conditions characteristic of and peculiar to a particular trade or occupation and cannot be an ordinary disease of life to which the general public is equally exposed. N.C. Gen. Stat. § 97-53. Booker v. Duke Medical Center, 297 N.C. 458,257 S.E.2d 189 (1979).
3. As a result of her employment with defendant-employer and her use of vibrating tools, plaintiff contracted the occupational disease of neuropraxia. That disease is characteristic of persons engaged in the occupation in which plaintiff was engaged and is not an ordinary disease of life to which the public is equally exposed. Plaintiff's use of vibrating tools proximately caused her occupational disease of neuropraxia. Rutledge v. Tultex Corp., 308 N.C. 85, 301 S.E.2d 359 (1983) and N.C. Gen. Stat. § 97-53(13).
4. As a result of her employment with defendant-employer, plaintiff developed bilateral carpal tunnel syndrome. Bilateral carpal syndrome is characteristic of persons engaged in working involving repetitive motion and the use of vibrating tools in assembly line production in which plaintiff was engaged. Carpal tunnel syndrome is not an ordinary disease of life to which the general public is equally exposed. By working at defendant-employers' plaintiff was at greater risk of developing carpal tunnel syndrome. Id.
5. Plaintiff reached maximum medical improvement with regard to her occupational disease of neuropraxia on 3 April 1997.
6. Plaintiff unjustifiably refused suitable employment offered to her within her medical restrictions on 25 March 1997 and continuing. Therefore, she is not eligible for temporary total disability benefits after that time. N.C. Gen. Stat. § 97-32.
7. Since plaintiff was diagnosed with carpal tunnel disease relatively soon after her employment with defendant-employer, and Dr. Henegar and Dr. LoPresti have indicated that this syndrome is characteristic of and peculiar to persons engaged in the occupation in which plaintiff was engaged and that the result placed her at a greater risk than a member of the general public in developing such a disease, she is entitled to medical compensation as a result of the disorder. N.C. Gen. Stat. §97-53 (13).
8. Plaintiff's unjustifiable refusal to return to work disqualifies her from receiving temporary total disability compensation. N.C. Gen. Stat. § 97-32.
9. Plaintiff has not proven by a preponderance of the medical evidence of record, that she is permanently and totally disabled or that she has any permanent partial disabilities associated with her work related injuries
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Plaintiff's claim for the compensable occupational disease of neuropraxia is GRANTED.
2. Plaintiff's claim for carpal tunnel syndrome is GRANTED in part and DENIED in part. Plaintiff is not entitled to indemnity benefits. Defendant shall pay medical benefits for plaintiff's carpal tunnel treatment or operations and tests performed by Dr. LoPresti and Dr. Henegar.
3. Plaintiff's claim for benefits pursuant to N.C. Gen. Stat. §97-31 is DENIED.
4. Plaintiff's claim for permanent and total disability benefits pursuant to N.C. Gen. Stat. § 97-29 is DENIED.
5. Defendant shall bear the costs.
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER